UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------X

**IBRAHIMA DIALLO,**

                     Plaintiff,

        -against-

**NEW YORK CITY POLICE DEPARTMENT,** a
municipal entity; 1—10 **NEW YORK CITY
POLICE OFFICERS "JOHN DOES"**, each of
the identified and the non—identified
persons in his individual capacity and
in his official capacity; **COUNTY OF
WESTCHESTER,** a municipal entity;
**WESTCHESTER COUNTY DEPARTMENT OF
PUBLIC SAFETY,** a municipal entity; 1—
10 **WESTCHESTER COUNTY DEPARTMENT OF
PUBLIC SAFETY POLICE OFFICERS "JOHN
DOES"**, each of the identified and the
non—identified persons in his
individual capacity and in his official
capacity **WESTCHESTER COUNTY
DEPARTMENT OF CORRECTIONS,** a
municipal entity; **WESTCHESTER MEDICAL
CENTER,** a municipal entity.

Defendants.

                  Defendants.

-------------------------------------------X

Case No.: _____

**COMPLAINT AND JURY
DEMAND**

      Plaintiff, **IBRAHIMA DIALLO,** through his counsel, **WILLIAMS
LLP,** files this Complaint against Defendants, The New York City
Police Department, 1—10 New York City Police Officers, The County

of Westchester, The Westchester Department of Public Safety, 1–10 Arresting Police Officers from the Westchester Department of Public Safety, the Westchester Department of Corrections, and the Westchester Medical Center for cause of action against the Defendants alleges as follows:

## NATURE OF THE ACTION

1.   Plaintiff, Ibrahima Diallo, is from Guinea. He is a practicing Muslim, and he suffers from tuberculosis of the spine—a non-contagious form of tuberculosis. Mr. Diallo escaped Guinea because the government prosecuted, jailed, and tortured him. Although Mr. Diallo was granted asylum when he immigrated to the United states, his days of being tortured were not over.

2.   Mr. Diallo has been arrested three times—all without even committing a crime. Mr. Diallo was arrested in 2017 for farebeating, i.e., being on a train without having bought a train ticket. Mr. Diallo, whose English was poor, had a ticket, but he did not understand the question posed to him. Mr. Diallo was arrested for farebeating when he, in fact, had a ticket. Mr. Diallo's second arrest was in 2019. Mr. Diallo was arrested then on the suspicion that "someone" in Mr. Diallo's building had a gun. When the New York Police Department found no gun, it dropped

charges against Mr. Diallo and others. Mr. Diallo and others were paid $10,000.00 each.

3.    Mr. Diallo's third arrest is the basis for this suit. On October 19, 2018, Police Officers from the Westchester Department of Public Safety and the New York City Police Department appeared at Mr. Diallo's apartment to arrest him on charges of Robbery in the 1st Degree, Robbery in the 2nd Degree, and Grand Larceny in the 3rd Degree. Mr. Diallo was jailed for 8 days in the Westchester County Jail, where he was denied proper doses of his medications, where he was subject to full body cavity searches, where he was kept in a cold cell, and where his bail was delayed. On October 21, 2022, after years of enduring poor treatment, losing his employment, and suffering indignities, the County of Westchester dismissed all charges against Mr. Diallo, admitting that Mr. Diallo could not have committed the crimes with which they charged him.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over this matter under 28 U.S.C.A. §§ 1331 and 1343 as well as the doctrine of pendant and supplementary jurisdiction under 28 U.S.C. § 1367.

5.   Venue is proper in this district under 28 U.S.C. § 1391(b) and (c).

**PARTIES**

6.   Defendant, **THE NEW YORK CITY POLICE DEPARTMENT,** is a political subdivision of the State of New York and a municipal entity. **THE NEW YORK CITY POLICE DEPARTMENT** has a service address at One Police Plaza, New York, New York 10038.

7.   Plaintiff, **IBRAHIMA DIALLO,** is an individual and a resident of the State of New York. Mr. Diallo lived at 1341 Leland Avenue Bronx, New York 10472, before his arrest. Mr. Diallo is currently seeking housing. Mr. Diallo lives with friends and family sometimes.

8.   Defendant, 1–10 **NEW YORK POLICE OFFICERS "JOHN DOES"** are New York City Police Officers who acted in their official and individual capacities in investigating Mr. Diallo. Specifically, the officers, acting in their individual and official capacities, passed on photographs of Mr. Diallo to allow their co-defendants to use Mr. Diallo's photographs in a police lineup.

9.   Defendant, **COUNTY OF WESTCHESTER,** is a political subdivision of the State of New York and a municipal entity. The County of Westchester operates, among other divisions, the Westchester

Department of Public Safety and operates the Westchester County Jail. **THE COUNTY OF WESTCHESTER** has a service address at 148 Martine Avenue, White Plains, New York 10601.

10. Defendant, **WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY,** is a political subdivision of the State of New York and a municipal entity, and it has a service address of 148 Martine Avenue, White Plains, New York 10601.

11. Defendant, 1–10 **WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY POLICE OFFICERS "JOHN DOES",** are police officers of **THE WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY** and each acted in their official and individual capacities in investigating and arresting Plaintiff. Each has a service address at 148 Martine Avenue, White Plains, New York 10601.

12. Defendant, **WESTCHESTER COUNTY DEPARTMENT OF CORRECTIONS,** is a municipal entity and is where Mr. Diallo was jailed from his arrest on October 19, 2021, until his release on bail on October 28, 2021. **WESTCHESTER COUNTY DEPARTMENT OF CORRECTIONS** has a service address at 10 woods Road Valhalla, New York 10595.

13. Defendant, **WESTCHESTER MEDICAL CENTER,** is a hospital that serves inmates at the **WESTCHESTER DEPARTMENT OF CORRECTIONS.** At all relevant times, the **WESTCHESTER MEDICAL CENTER,** provided

substandard medical services to Plaintiff. The **WESTCHESTER MEDICAL CENTER** has a service address at 100 Woods Road, Valhalla, New York 10595.

## FACTUAL ALLEGATIONS

14.  Mr. Diallo has been living in the United States legally, as a political asylee, since 2010.

15.  Since his entry into the United States, Mr. Diallo has been a law-abiding New York resident, and he has pursued a productive life.

16.  To better his English, Mr. Diallo took college-level ESL classes and worked to sustain himself and his family.

17.  One of Mr. Diallo's jobs was to work as a handyman.

18.  Mr. Diallo provided handyman service at 1341 Leland Avenue Bronx, New York 10472.

19.  In exchange for providing handyman services, Mr. Diallo was given an apartment with a market rent value of $3,700.00.

20.  Mr. Diallo subdivided the apartment he was given and rented it to a third party and earned an additional $700.00 per month.

21.  Besides his handyman work, Mr. Diallo worked at several restaurants as a dishwasher.

22.  Before his arrest, Mr. Diallo earned $43,200 per year (or $900.00 per week) as a dishwasher.

23.  Mr. Diallo enjoyed an ordinary and peaceful life: (i) he never had a criminal record; (ii) he's never committed a crime; and (iii) be remained dedicated to bettering himself by getting an education.

24.  But the New York Police Department kept bothering Mr. Diallo, if only because Mr. Diallo is Guinean.

25.  In 2010, after Mr. Diallo emigrated to the United States, he purchased a train ticket.

26.  Although Mr. Diallo had purchased a ticket, he could not speak English (he only spoke French at the time), and he did not understand the Police Officer's request for his ticket.

27.  The Police officer wrote Mr. Diallo a citation.

28.  When Mr. Diallo obtained help, the issue was clarified as a mistake and the citation was dismissed.

29.  In 2017, Mr. Diallo, and others had a run in with the New York Police Department.

30.  The New York Police Department came to Mr. Diallo's address and arrested everyone in Mr. Diallo's building, including Mr. Diallo, claiming that someone in Mr. Diallo's building had a gun.

31.  Mr. Diallo has never owned a gun.

32.  The New York Police Department later paid Mr. Diallo (and others) $10,000 each, dropped all charges against Mr. Diallo and apologized to him.

33.  Mr. Diallo's third interaction with the New York City Police Department occurred on October 19, 2018.

34.  On that day, police officers from the New York City Police Department and police officers from the Westchester Department of Public Safety arrested Mr. Diallo on charges of: (i) Robbery in the first degree; (ii) Robbery in the 2nd Degree; and (iii) Grand Larceny in the 3rd Degree.

35.  Defendants arrested Mr. Diallo acting on indictment number 18–0581–01–02, in which Defendants claim Mr. Diallo had been involved in a robbery in Yonkers.

36.  The Indictment alleged that the robbery occurred on February 18, 2022, at 4:25 AM.

37.  the Indictment also stated that the armed robbery occurred at 38 Morris Street, "in the City of Yonkers, County of Westchester, State of New York." See Motion to Dismiss Indictment, attached hereto as **Exhibit 1**.

38.   According to the Indictment, Richard Ferreras, and his friend (the "Victims"), had returned from a concert in Manhattan.

39.   Around 4:30 AM, the Victims claimed three individuals robbed them at gunpoint. Id.

40.   One individual who was alleged to have robbed the Victims was Musa Krubally.

41.   Musa Krubally was born in Guinea.

42.   New York City Police Department arrested Musa Krubally on February 22, 2019. Id.

43.   The robbers allegedly stole an expensive Audemars Piguet watch, an MCM bag, and a gold Cuban linked chain. Id.

44.   The robbers used a car in carrying out the robbery, and that car had a temporary New Jersey license plate No.: 060293R. Id.

45.   The robbery happened when it was dark, and the Victims did not see the robbers.

46.   The car used in the robbery was not Mr. Diallo's car.

47.   Neither the New York City Police Department nor the Westchester Department of Public Safety worked hard enough to determine the owner of the car used in the robbery.

48.   Defendants did not find the watch, the bag, or the Cuban linked chain with Mr. Diallo.

49.  Mr. Diallo not related to Musa Krubally.

50.  Mr. Diallo is not friends with Musa Krubally.

51.  Mr. Diallo has never been friends with Musa Krubally.

52.  Defendants did not have evidence that linked Mr. Krubally and Mr. Diallo.

53.  Musa Krubally never identified Mr. Diallo as his accomplice in carrying out the armed robbery.

54.  Musa Krubally told the New York City Police Department that he did not know Mr. Diallo.

55.  Musa Krubally has a lengthy criminal record.

56.  Mr. Diallo has no criminal record.

57.  Mr. Diallo voluntarily gave his cellphones to the Westchester Department of Public Safety for them to analyze and determine whether Mr. Diallo had been at the location of the armed robbery.

58.  The Westchester Department of Public Safety claimed it would analyze Mr. Diallo's phone, and, from that analysis, it would determine whether Mr. Diallo was where the armed robbery happened.

59.  The Westchester Department of Public Safety never got back to Mr. Diallo, and it never returned Mr. Diallo's cellphones.

60.   The Westchester County Department of Public Safety had information that Mr. Diallo's cell phones showed that Mr. Diallo was not, and had never been to, the location of the armed robbery.

61.   Westchester County Department of Public Safety did not share this exculpatory information with Mr. Diallo.

62.   Mr. Diallo's arrest, charge, and confinement came about only because he is Guinean.

63.   Since at least 1999, the City of New York Police Department has had a policy and practice—formal and informal—that linked individuals of the same race or national origin to a crime if at least one perpetrator was of the same race as the individual the New York City Police Department sought to include as a suspect.

64.   The New York City Police Department sets out the policies and practices on investigations and arrests in its Administrative Guide and other Policies. See, e.g., Administrative Guide Procedure No. 303-04, 303-11.

65.   For example, if the New York City Police Department saw that a person suspected of committing a crime was Guinean and if there were multiple individuals accused of committing the crime, the New York Police Department would then look for other guineas to

add in the suspect pool to arrest all individual suspected of committed a crime.

66.   Thus, if multiple suspects were thought to be involved in a crime and one of them was of certain national origin, other suspects would include individuals of the same national origin.

67.   This policy and practice were at play when Mr. Diallo's name was included in the list of suspects.

68.   Statistics by the New York Police Department exposes this policy and practice.

69.   For the year 2018—when the crime Mr. Diallo was said to have committed occurred—65.8% of the individuals suspected of committing the crime of robbery were black/African.

70.   Of the 65.8% black/African individuals suspected of committing robbery in 2018, 60.5% of them were arrested.

71.   Less than 7% of the individuals arrested were convicted of the crime charged.

72.   In fact, the black/Africans included in the suspect pool had been included in that pool based solely on their race or national origin.

73. This policy and practice, as reflected in the statistics produced by the New York City Police Department, has been endorsed by the highest level of the New York City Government.

74. That policy and practice were at play in this case.

75. The armed robbery that formed the basis of Mr. Diallo's arrest involved a person from Guinea.

76. Defendant, the County of Westchester Department of Public Safety, disclosed to the City of New York Police Department that a person of Guinean origin was involved in an armed robbery in Yonkers, New York.

77. Under its policy and practice of linking individuals of the same national origin to crimes, the City of New York supplied of picture of Mr. Diallo to the County of Westchester Department of Public Safety, claiming that Mr. Diallo should be added to the suspect pool because the other participant in the crime—Mr. Krubally—was Guinean.

78. The County of Westchester Department of Public Safety then adopted the New York City Police Department policy and practice and added Mr. Diallo to the list of suspects who could have participated in the armed robbery.

79.   Other than the fact that Mr. Diallo was Guinean and that one suspect who took part in the armed robbery was Guinean, there was nothing that linked Mr. Diallo to the armed robbery.

80.   Despite their efforts, neither the City of New York nor the County of Westchester have been able to explain credibly how Mr. Diallo—someone who has never committed a crime and someone who does not have a criminal record—would be linked to the armed robbery with which he was charged.

81.   Besides adopting the policy and practice of the City of New York Police Department, the Westchester Department of Public Safety has pursued a policy and practice of aggressive crime prosecution.

82.   The Westchester Department of Public Safety also has a set of formal Policies and Practices that guided its conduct in arresting, prosecuting and jailing Mr. Diallo.

83.   For example, §§ 102, 104, 105, 111, 112, 113, 119, 120, and 124 of the Westchester Department of Public Safety Manual all provide relevant practices and policies that were used in arresting, jailing, and prosecuting Mr. Diallo.

84.  George Latimer, the County Executive of Westchester County, has expressed this policy and practice of being aggressive on crime frequently in video and in other media.

85.  This policy has had the intended effect of forcing law enforcement officers to make cases even where there is no case to be made.

86.  For example, in Mr. Diallo's case, there was no evidence that linked Mr. Diallo to the armed robbery for which he was arrested.

87.  Mr. Diallo had never been to Yonkers.

88.  Mr. Diallo is not related to the individuals accused of committing the crime.

89.  Yet, in its effort to be aggressive on crime, the County of Westchester accepted photographs from the City of New York of Mr. Diallo.

90.  The County of Westchester posted Mr. Diallo's picture in the lineup even though it had no evidence linking Mr. Diallo to the armed robbery.

91.  The Lineup was suggestive and failed every applicable constitutional test.

92.   Despite countervailing evidence, the County of Westchester Department of Public Safety charged, jailed, and prosecuted Mr. Diallo for a crime Mr. Diallo did not commit.

93.   Mr. Diallo's arrest was brutal.

94.   Police Officers from the Westchester Department of Public Safety and Police Officers from the New York City Police Department showed up at Mr. Diallo's apartment at around 6:00 AM.

95.   Mr. Diallo suffers from tuberculosis of the spine.

96.   Mr. Diallo told the arresting officers of his medical condition.

97.   During his arrest, Police Officers from the Westchester Department of Public Safety and the New York City Police Department bent, squeezed, and shoved Mr. Diallo such that Mr. Diallo's spine curved to where he lost feeling in his lower body and his extremities.

98.   The way the arresting officers handled Mr. Diallo was so forceful that it caused his condition to worsen.

99.   Mr. Diallo was not treated better in jail.

100. When he arrived at the Westchester Department of Corrections to be jailed, Mr. Diallo was subject to strip search consistent

with Section 112.03 of the County of Westchester Department of Public Safety Manual.

101. Defendants also isolated Mr. Diallo claiming that his tuberculosis was contagious.

102. Tuberculosis of the spine is not contagious.

103. when he arrived at the jail, Mr. Diallo also explained to the detention officers that he had brought his medication so that he could take it while confined.

104. Under Westchester County Department of Corrections policy and practice, the jail did not make accommodations for Mr. Diallo.

105. Under Section 112.04, the Westchester Department of Corrections refused to allow Mr. Diallo to take his medications in the appropriate dosage.

106. Instead, The Westchester County Department of Corrections stated that the Westchester County Medical Center would provide medical care to Mr. Diallo while Mr. Diallo was jailed under that same policy.

107. In fact, the Medical Center failed to provide proper care to Mr. Diallo.

108. Even though the Westchester Medical Center knew Mr. Diallo suffered from tuberculosis of the spine, it placed Mr. Diallo in a

room jail cell that was too cold and made his medical condition worse.

109. In addition, even though the Westchester Medical Center knew of Mr. Diallo's medical condition, it refused to allow him to take his medication in the proper dosage.

110. The Westchester Medical Center isolated Mr. Diallo even though it knew Mr. Diallo's medical condition was not contagious.

111. In denying Mr. Diallo the proper medical care, the Westchester County Department of Corrections and the Westchester County Medical Center were acting under Section 112.01 of the Departmental Manual on Custody and Detention of Prisoners.

112. When asked why he could not take his medication to provide him relief, the Westchester County Medical Center claimed that under rules and policies put in place by the Westchester Department of corrections, Mr. Diallo's medication was defined as narcotics, which was not allowed under Section 112.04 of the Departmental Manual on Custody and Detention of Prisoners.

113. The Westchester County Department of Corrections did not provide any other medications to Mr. Diallo consistent with its policy and practice in Section 112.01.

114. Although Mr. Diallo was jailed for 8 days, the Westchester County Medical Center only saw him once.

115. The Westchester Department of Corrections did not provide Mr. Diallo any medical care that would relieve his condition.

116. Westchester County Medical Center did not transfer Mr. Diallo to a more temperate section of the jail.

117. In fact, the Westchester Medical Center did not take any action that a reasonably prudent medical doctor would take in caring for Mr. Diallo's medical condition.

118. The consequences of the Westchester Medical Center's inactions were that Mr. Diallo's condition grew worse.

119. Mr. Diallo suffered an extraordinary amount of pain while confined.

120. The pain caused Mr. Diallo to lose appetite and could not eat the food provided to him in jail.

121. Mr. Diallo was forced languished in jail while he suffered substantial pain without receiving the proper medical care.

122. In the 8 days he was jailed, Mr. Diallo lost a substantial amount of weight.

123. Mr. Diallo wanted to kill himself.

124. Upon his release from jail on bail, Mr. Diallo fell into a deep depression.

125. Mr. Diallo remains in a deep depression because of Defendants' acts and omissions described in this Complaint.

126. Mr. Diallo remains deeply depressed.

127. Mr. Diallo has lost all employment.

128. Mr. Diallo currently has no income.

129. Mr. Diallo is currently living with individuals because he has no home.

130. Mr. Diallo may soon be homeless because he cannot obtain employment.

### FIRST CAUSE OF ACTION: MALICIOUS PROSECUTION

(AGAINST NEW YORK CITY POLICE DEPARTMENT; THE COUNTY OF WESTCHESTER; COUNTY OF WESTCHESTER DEPARTMENT OF PUBLIC SAFETY; WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY POLICE OFFICERS "JOHN DOES;" AND JOHN DOES 1–10)

131. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

132. On October 19, 2021, Defendants, maliciously and without probable cause, caused Mr. Diallo to be arrested under a warrant and jailed Mr. Diallo for 8 days at the Westchester County Department of Corrections in violation of 42 U.S.C. § 1983.

133. Defendants also used excessive force against Mr. Diallo when they were arresting Mr. Diallo and improperly placed Mr. Diallo in a criminal lineup before his arrest.

134. This proceeding was ended in favor of Mr. Diallo.

135. As the County of Westchester concluded, it had no probable cause to bring the proceeding against Mr. Diallo, as Mr. Diallo could not have committed the crimes with which he was charged.

136. Defendants acted with malice in maliciously prosecuting Mr. Diallo.

137. Mr. Diallo has suffered damages, including punitive damages, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION: DEFAMATION—FALSE LIGHT
(AGAINST: NEW YORK CITY POLICE DEPARTMENT)

138. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

139. Defendant, New York City Police Department, provided Defendant, Westchester County, with pictures of Mr. Diallo, showing that Mr. Diallo was among the individuals who had committed the robbery.

140. Mr. Diallo did not know that the New York City Police Department had provided his picture to the Westchester County

Department of Corrections until the Westchester Department of Corrections said so in its papers dismissing the prosecution against Mr. Diallo.

141. Westchester County did not investigate the pictures sent to them by the New York Police Department, but caused those pictures to be placed in a line-up and provided the pictures to third parties, including the alleged victims who made a mistaken identification.

142. The New York City Police Department and the County of Westchester each published Mr. Diallo's pictures without privilege and without authorization to third parties: the New York City Police Department published Mr. Diallo's pictures to Westchester County and Westchester County published Mr. Diallo's pictures to third parties, including the victim of the armed robbery.

143. Defendants were at least reckless (and certainly negligent) in publishing Mr. Diallo's pictures.

144. The publication has caused Mr. Diallo special harm and constitutes defamation per se.

145. Mr. Diallo has suffered damages, including attorney's fees and costs and punitive damages, because of Defendants' defamatory conduct.

### THIRD CAUSE OF ACTION: FALSE IMPRISONMENT/FALSE ARREST
(AGAINST DEFENDANTS: COUNTY OF WESTCHESTER; WESTCHESTER DEPARTMENT OF CORRECTIONS)

146. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

147. Defendants intended to arrest and confine Mr. Diallo to the Westchester County Department of Corrections for 8 days or longer and did so confine Mr. Diallo.

148. Mr. Diallo was conscious of the confinement.

149. Mr. Diallo did not consent to his confinement as he expressed his innocence from the very beginning of his arrest.

150. Mr. Diallo's confinement was not otherwise privileged.

### FOURTH CAUSE OF ACTION: NATIONAL ORIGIN DISCRIMINATION
(AGAINST DEFENDANTS: NEW YORK CITY POLICE DEPARTMENT AND THE WESTCHESTER DEPARTMENT OF PUBLIC SAFETY)

151. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

152. Because Mr. Diallo is Guinean, he was added to a list of suspects because it was reported that another Guinean was involved in committing the crime.

153. Had Mr. Diallo had a different name, like John Smith instead of Ibrahima Diallo, his picture would not have been included in a lineup of a crime he never committed.

154. The New York City Police Department and the Westchester Department of Public Safety added Mr. Diallo's name to the list of suspects simply because he is from Guinea and has a Guinean name.

155. Defendants are therefore liable to Mr. Diallo in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

156. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

157. Defendants included Mr. Diallo is a lineup as a suspect for a crime he did not commit, he was subject to a strip and cavity search, he was denied his medications, he was denied the ability to pray while imprisoned, Defendants refused to provide

exculpatory evidence to Mr. Diallo, among other wrongs committed against Mr. Diallo by Defendant.

158. This conduct, as described in this Complaint and additional discovery will uncover, is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

159. Mr. Diallo has suffered damages in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF: MEDICAL MALPRACTICE
(AGAINST WESTCHESTER MEDICAL CENTER)

160. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

161. The medical practitioners who perform medical services for them owe imprisoned individuals a duty to provide medical care and treatment at the accepted medical standard.

162. Defendants, The County of Westchester, the Westchester Department of Corrections, and Westchester Medical Center breached this duty to Mr. Diallo when they placed him in a room suitable temperature which worsened his medical condition; when they refused to grant Mr. Diallo the proper dosage of his

medication, which forced him to hallucinate and contemplate suicide; and when they failed to provide him with the proper nutrition.

163. In failing to provide Mr. Diallo proper care Defendants, The County of Westchester and the Westchester Medical Center were negligent and breached the duty owed to Mr. Diallo.

164. The County of Westchester and the Westchester Medical Center are liable to Mr. Diallo in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF: VIOLATION OF THE FIRST AMENDMENT AND ART. 1 § 3 OF THE NY CONSTITUTION
(AGAINST DEFENDANT WESTCHESTER DEPARTMENT OF CORRECTIONS)

165. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

166. As alleged above, Mr. Diallo is a devout practicing Muslim.

167. Mr. Diallo is a peaceful individual and practices his religion that way.

168. Under the tenants of Islam, a man may not expose himself to other men.

169. The act of disrobing oneself is haram—i.e., forbidden.

170. After arresting Mr. Diallo, Defendants brought him into the prison where, during the booking process, Defendant forced Mr. Diallo to disrobe.

171. Other men were present when Mr. Diallo was forced to disrobe under § 112.03 of the County of Westchester Department of Public Safety Manual.

172. Mr. Diallo pleaded with the officers on site that he was Muslim and that he could not disrobe in front of other men.

173. Defendants failed to heed Mr. Diallo's pleas and instead applied Section 112.03.

174. Mr. Diallo also tried to pray while imprisoned.

175. Muslims must pray five times a day—at dawn, at noon, at mid-afternoon, at sunset, and during the evening.

176. Mr. Diallo was kept in a separate cell and asked for a matt or cloth so that he could pray, but no one responded to him for days.

177. The consequences of Defendants actions are that Mr. Diallo could not even though at that moment, Mr. Diallo needed prayer the most.

### EIGHTH CLAIM FOR RELIEF: AIDING AND ABETTING
(AGAINST THE NEW YORK CITY POLICE DEPARTMENT; 1-10 ARRESTING AND INVESTIGATING OFFICERS NEW YORK CITY POLICE DEPARTMENT)

178. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

179. The City of New York provided Mr. Diallo's picture to the Westchester Department of Public Safety.

180. The New York City Police Department provided Mr. Diallo's picture to the County of Westchester Department of Public Safety, even though Mr. Diallo is not a criminal and even though Mr. Diallo was never involved in any crimes.

181. The Westchester Department of Public Safety then used Mr. Diallo's picture in a discriminatory line up and had Mr. Diallo identified.

182. The supply of Mr. Diallo's picture to the County of Westchester Department of Public Safety led to the violation of Mr. Diallo's constitutional rights.

183. The New York City Police Department is therefore liable to Mr. Diallo in an amount to be proven at trial.

### NINTH CLAIM FOR RELIEF: CONVERSION/REPLEVIN
(AGAINST WESTCHESTER DEPARTMENT OF PUBLIC SAFETY AND WESTCHESTER DEPARTMENT OF CORRECTIONS)

184. Plaintiff incorporates Paragraphs 1 through 71.

185. Mr. Diallo provided two cell phones to Defendants for them to analyze to clear his name from the suspects who had committed armed robbery.

186. Mr. Diallo's owned the phones that he provided to Defendants.

187. Defendants had no interest in Mr. Diallo's phones.

188. Defendants have exercised dominion and control over Mr. Diallo's phones even though the case has concluded.

189. Mr. Diallo has demanded the return of his phones, but Defendants have not returned his phones.

190. Defendants are liable to Mr. Diallo, as Mr. Diallo has a superior claim of right to his phones.

### TENTH CLAIM FOR RELIEF: INJUNCTIVE RELIEF UNDER § 1983
#### (AGAINST THE NEW YORK CITY POLICE DEPARTMENT; THE COUNTY OF WESTCHESTER; AND THE WESTCHESTER DEPARTMENT OF PUBLIC SAFETY)

191. Plaintiff incorporates the previous allegations as if those allegations were set forth in this paragraph.

192. Mr. Diallo has submitted along with this Complaint setting out his entitlement to injunctive relief against Defendants to remove his profile from their respective criminal data bases.

### JURY DEMAND

Mr. Diallo seeks a jury trial on all claims triable by jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, **IBRAHIMA DIALLO**, demands judgment against the Defendants, pre-and-post judgement interest, attorney's fees and costs, and all other relief as to the Court may seem just and proper.

DATED:      February 14, 2023.
            New York, New York

                              **RESPECTFULLY SUBMITS,**

                              */s/ T. Edward Williams, Esq.*
                              T. Edward Williams, Esq.
                              WILLIAMS LLP
                              45 Rockefeller Plaza 20th FL
                              New York, New York 1011
                              (212) 417–0430 (Main)
                              (212) 417–0431 (Direct)
                              (212) 417–0433 (Fax)
                              Edward@williamsllp.com
                              ***ATTORNEYS FOR PLAINTIFF***